1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

JOYCE M. RANKINE; LAWRENCE
S. STANTON,

11
                                        Plaintiffs,
12          v.

13   ROLLER BEARING COMPANY OF
     AMERICA, INC,; DOES 1
14   THROUGH 10, inclusive

15                                      Defendants.
16   _____
17   ROLLER BEARING COMPANY OF
     AMERICA, INC.,
18
                                   Counter Claimant,
19          v.
20   JOYCE RANKINE; LAWRENCE S.
     STANTON,
21
                              Counter Defendants.
22

NO. 12-CV-2065-MMA (BLM)

**ORDER GRANTING
PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

[Doc. No. 91]

23          Presently before the Court is Plaintiffs'/Counter Defendants' Joyce Rankine

24   and Lawrence Stanton's ("Plaintiffs") motion for summary judgment.  [Doc. No.

25   91.]  Defendant/Counter Claimant Roller Bearing Company of America

26   ("Defendant" or "RBC") opposed the motion, and Plaintiffs filed a reply.  [*See* Doc.

27   Nos. 97, 102.]  For the reasons set forth below, the Court **GRANTS** Plaintiffs'

28   motion for summary judgment.

**BACKGROUND**[1]

This is a breach of contract case arising from a dispute over the payment of two promissory notes executed in connection with the sale of capital stock.

In 2006, Plaintiffs Joyce Rankine and Lawrence Stanton, in addition to Ms. Rankine's late husband, Baxter Rankine, were the three sole shareholders in All Power Manufacturing, Inc. ("All Power").  All Power principally designs and manufactures bushings for the aerospace industry.

On September 11, 2006, Plaintiffs entered into a Stock Purchase Agreement ("Agreement") with Defendant RBC, a bearings manufacturer, to sell their outstanding shares in All Power for a total price of $10,321,163.  [Defendant's Statement of Disputed Facts ("DSF") ¶ 1, Doc. No. 99; Agreement § 2.2.]  The parties executed two Non-Negotiable Promissory Notes in connection with the Agreement—one note in favor of Rankine ("Rankine Note")[2] and one in favor or Stanton ("Stanton Note") (together "Notes").  [Plaintiffs' Statement of Undisputed Facts ("SUF") ¶ 1, Doc. No. 91-1.]  The principal amount of the Rankine Note is $600,000 with an annual interest rate of 6.5%.  [*Id.*]  The principal amount on the Stanton Note is $150,000 with an annual interest rate of 6.5%.  [*Id.*]  Both Notes were originally payable in full on September 12, 2007.  [*See* Non-Negotiable Promissory Notes, Doc. Nos. 91-3, 91-4.]

Section 1.3 of the Notes permits RBC to "set-off" the amount due under the Notes should RBC be entitled to indemnification or payment as set out in the Stock Purchase Agreement.  [*See id.* § 1.3.]  On September 10, 2007, two days before the Notes became due, RBC exercised its set-off rights, claiming (1) All Power was unable to collect $12,406 of accounts receivable; (2) $98,451 of All Power inventory

---

[1] These facts are not reasonably in dispute unless otherwise noted.

[2] After the Rankine Note was executed, Plaintiff Rankine's husband, Baxter Rankine, passed away and she became the successor-in-interest to his right to payment under the Rankine Note.  [SUF ¶ 2.]

was not usable; (3) RBC was required to make an estimated corporate income tax payment of $150,000; and (4) RBC was exposed to Mexican income taxes in excess of $900,000.  [DSF ¶ 93-94.]  Of these four claims, the Mexico tax issue was of the greatest concern for RBC.  [*Id.* ¶ 95.]  Plaintiffs disputed that any Mexican taxes were owed.  The parties each hired independent Mexican counsel to assess the tax liability to RBC.  After nearly a year and a half of investigation, the parties agreed that there was a five-year statutory period within which RBC was potentially exposed to tax liability in Mexico.  [*Id.* ¶¶ 95-96.]  Accordingly, the parties agreed to extend the payment date on the Notes past the five-year liability period to June 30, 2012.  Additionally, the parties amended the Notes' set-off provision as follows:

> Limitation on Right of Set-Off.  Notwithstanding anything to the contrary set forth in Section 10.7 of the Agreement or Paragraph 1.3 of the Note, unless on or prior to June 30, 2012, [RBC] receives a communication from the Mexican taxing authorities alleging a tax due from All Power relating to the period prior to September 11, 2006 (a "Mexico Tax Claim"), the principal amount of the Note, and all accrued and unpaid interest thereon, shall be paid in full by [RBC] on June 30, 2012, ***without off-set of any kind or nature***.  If a Mexico Tax Claim is received by [RBC] on or prior to June 30, 2012, then the provisions of the Stock Agreement and the Note applicable thereto will apply in full force and effect.

[Amendments to Notes, Doc. Nos. 91-3, 91-4 (emphasis added).]

RBC did not receive any communications from the Mexican tax authority prior to June 30, 2012.  [SUF ¶ 4.]  However, RBC refused to pay the amounts due under the Notes, claiming that it did not agree to waive RBC's set-off rights.  [DSF ¶ 99.]  Instead, RBC maintained that the Amendments to the Notes were limited to resolution of the Mexico tax set-off claim, and that the only set-off claims waived were the three remaining, known set-off claims (accounts receivable, inventory, and U.S. tax issues) listed in the September 2007 letter.  [DSF ¶ 100-101.]

This action followed.  In their state-court complaint, Plaintiffs assert breach of contract claims relating to RBC's failure to fulfill its obligations under both Notes.  After removing to this Court, RBC simultaneously answered and counterclaimed for, *inter alia*, breach of contract and fraud.  [Doc. Nos. 4-5.]  After the Court dismissed

RBC's counterclaim for failure to state a claim, RBC filed the operative First Amended Counterclaim ("FAC"). [Doc. No. 42.] Defendant's FAC revolves around its allegations that former All Power employees, David Rankine, Jeffrey Rindskopf, Charles Sharp, David McCulloch, and Mary Alvarado illegally used All Power's intellectual property to unfairly compete with RBC. [*See* FAC ¶ 16.] On February 5, 2013, Plaintiffs moved to dismiss the FAC on grounds that (1) any alleged misconduct by All Power employees occurred after the sale of All Power to RBC, and (2) RBC is contractually barred from making claims of set-off. [*See* Doc. No. 43-1.] The Court denied Plaintiffs' motion, accepting as true Defendant's allegations that the alleged misconduct occurred before the sale and that the amendment to the Notes only limited the Mexico tax set-off. [Doc. No. 70.]

Plaintiffs move for summary judgment as to both their claims and Defendant's FAC. Plaintiffs argue that no genuine issues of material fact remain as to Defendant's obligation to perform under the Notes.

<u>**LEGAL STANDARD**</u>

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). The moving party bears the initial burden of informing the Court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. *Id.* at 323. The evidence and all reasonable inferences therefrom must be viewed in the light most favorable to the non-moving party. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987).

If the moving party meets its initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue of

material fact for trial. *Celotex*, 477 U.S. at 324. The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588 (1986). When a party fails to properly address another party's assertions of fact, a court may consider these facts as undisputed. Fed. R. Civ. P. 56(e)(2). If the motion and supporting materials, including facts considered undisputed, show the movant is entitled to summary judgment, the Court may grant the motion. Fed. R. Civ. P. 56(e)(3). Summary judgment is not appropriate if the non-moving party presents evidence from which a reasonable jury could resolve the disputed issue of material fact in his or her favor. *Anderson*, 477 U.S. at 248; *Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir.1991). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## DISCUSSION

### I.    Plaintiffs' Breach of Contract Claims

Plaintiffs seek summary judgment on their breach of contract claims. In California, "[a] cause of action for breach of contract requires proof of the following elements: (1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." *CDF Firefighters v. Maldonado*, 158 Cal. App. 4th 1226, 1239 (2008).

The existence of a contract is undisputed.[3] The point of contention is whether RBC breached the contract by failing to pay the amount due under the Notes on June 30, 2012. RBC contends that it had a contractual right to withhold payment because the contract allowed it to "set-off" the amount due. RBC further argues that its obligation to pay under the Notes was excused by Plaintiffs' prior breach of the Agreement. RBC's theory of breach has shifted dramatically throughout the

---

[3] Consisting of the Agreement, concomitant Notes, and subsequent amendments to the Notes.

1   duration of this case.  In the beginning, RBC claimed that "Key Employees" for All

2   Power fraudulently misappropriated the company's trade secret information and

3   used the information to start a competing business.  This theory has been nearly

4   abandoned.  RBC's most recent defense is that Plaintiffs breached the Agreement by

5   failing to transfer all of the intellectual property necessary to conduct the business of

6   All Power.  [*See* Opp. at 18.]  The Court will consider the arguments regarding set-

7   off rights and excuse for nonperformance in turn.

8                          **A.    Set-Off Rights**

9          As a defense to breach, RBC asserts it has a contractual right to set-off the

10   amount due under the Notes.  Preliminarily, RBC presents no evidence

11   demonstrating the monetary value of its set-off claims.  However, as RBC withheld

12   the entire sum due under the Notes, it appears RBC believes it is entitled to set-off

13   $750,000.  In any event, this defense is unavailing because RBC unambiguously

14   waived its set-off rights.  The Amendments to the Notes clearly provide that

15   "[U]nless on or prior to June 30, 2012 [RBC] receives a communication from the

16   taxing authorities alleging a tax due from All Power . . . , the principal amount of the

17   Note, and all accrued and unpaid interest thereon, shall be paid in full by [RBC] on

18   June 30, 2012, ***without off-set of any kind or nature***."  [Amendments to Notes, Doc.

19   Nos. 91-3, 91-4.]  RBC asserts that it only waived its right to claim then existing set-

20   offs, not to unforeseen and unknown set-offs.  [Opp. at 22.]  RBC argues that even if

21   a written agreement is clear and unambiguous on its face, a trial court must receive

22   relevant extrinsic evidence that could prove a meaning to which the language of the

23   contract is "reasonably susceptible."  [Opp. at 20 (citing *Pacific Gas and Electric

24   Co. v. G. W. Thomas Drayage Co.*, 69 Cal.2d 33, 37 (1968).]  RBC contends that the

25   language of the amendments could reasonably be interpreted as being limited to the

26   set-offs raised at the time the Mexican tax issue arose.

27          Defendant errs not in its interpretation of the admissibility of extrinsic

28   evidence, but in its failure to *offer any*.  Indeed, Defendant fails to provide any

1  extrinsic evidence to clarify the parties' intended meaning of the language in the

2  amendments.  Instead, Defendant relies on the very language of the amendments:

3  "The *language of the Amendments* demonstrates that they could reasonably be

4  interpreted as being limited to the set-offs raised at the time the Mexican tax issue

5  arose."  [Opp. at 21 (emphasis added).]  The Court disagrees.  The language of the

6  amendments, without any extrinsic evidence demonstrating otherwise, is reasonably

7  susceptible to only one meaning—that RBC's right to set-off was extinguished

8  entirely when it did not receive a Mexico tax claim by June 30, 2012.

9  <h3 align="center">B.    Excuse for Nonperformance</h3>

10  Next, RBC contends that its obligation to pay under the Notes was excused by

11  Plaintiffs' prior breach of the Agreement.  RBC argues that its performance under

12  the Notes was "*conditioned upon* RBC's indemnification and set-off rights," [Opp.

13  at 23 (emphasis added)] so that "Plaintiffs' failure to convey to RBC the intellectual

14  property assets it represented belonged to them[4] thereby excused any

15  counter-performance by RBC under the Notes."  [Opp. at 18.]  RBC states that its

16  duty to perform under the notes "hinges on a factual determination of whether

17

18

19  [4] RBC claims that Plaintiffs failed to disclose that certain "Parts Manufacture Approvals"
("PMA") obtained from the Federal Aviation Administration ("FAA") were based on the Boeing

20  Company's proprietary information.  A PMA is a combined design and production approval for
modification and replacement articles issued by the FAA.  Receipt of a PMA allows a

21  manufacturer to produce and sell these articles for installation on type certified products.  *See*
FAA, *Parts Manufacturer Approval*, http://www.faa.gov/aircraft/air_cert/design_approvals/pma/

22  (last visited Oct. 31, 2013).  One way to receive a PMA is to show that the replacement part is
identical to the original part.  To demonstrate identicality, applicants seek "assist letters" from the

23  approved part's owner.

24  In 2000 and 2001, the FAA issued All Power approximately 17 PMAs for the
manufacturing of Boeing Commercial Airplane Group parts.  The PMAs were based on assist

25  letters Boeing supplied All Power.  Currently, Boeing is seeking a licensing agreement from RBC
based on All Power's manufacturing of Boeing replacement parts.  [DSF ¶ 72.]  RBC fears that if

26  it does not enter Boeing's licensing agreement, Boeing may notify the FAA that its "assist letters"
to All Power are no longer applicable.

27  RBC contends that Plaintiffs' failure to disclose the fact that the PMAs were premised on

28  Boeing's assist letters constitutes a breach of the Agreement wherein Plaintiffs represented it was
transferring all of the intellectual property assets necessary to conduct All Power's business.

Plaintiffs first breached the written agreements."[5]  [*Id.*]

RBC improperly characterizes its duty to perform under the Notes as "conditional."  "A condition is a fact, the happening or nonhappening of which creates (condition precedent) or extinguishes (condition subsequent) a duty on the part of the promisor.  If the promisor makes an absolute or unconditional promise, he or she is bound to perform when the time arrives."  Witken, *Summary of Cal. Law* (10th ed. 2005) Contracts § 776.  Here, RBC's duty to pay under the Notes was unconditional.  Nothing in the Agreement indicates that payment could be excused by the happening or nonhappening of any fact.  Rather, the Agreement and Notes are clear that on September 12, 2006, RBC purchased All Power from Plaintiffs for a total of $10,321,163, $750,000 of which was due at a later date.  RBC errs in considering the set-off provision in the Agreement as a contractual condition.  The set-off provision—subsequently waived—permitted RBC to adjust the amount due under the Notes should RBC be entitled to indemnification or payment as set out in the Agreement.  Yet while the set-off provision potentially decreased the amount owed, it did not render RBC's performance conditional.

Furthermore, the case timeline demonstrates that RBC did not have a viable excuse for nonperformance on June 30, 2012.  In RBC's counterclaim and first amended counterclaim, filed September 4, 2012 and January 23, 2013, RBC claimed that Plaintiffs previously breached the Agreement on a theory of "Key Employee" misconduct.  As set forth below, this theory is meritless.  RBC's revised theory of breach, namely that Plaintiffs misrepresented the nature of All Power's PMAs, did not arise until shortly before the close of discovery in June 2013.  [*See* DSF ¶¶ 71-72.]  Clearly, RBC did not have a valid excuse for nonperformance on June 30,

---

[5] RBC cites *Stewart v. Life Ins. Co. of N.A.*, 388 F. Supp. 2d 1138 (E.D. Cal. 2005) for the proposition that "Plaintiffs' breach of the Stock Purchase Agreement—by misrepresenting All Power's ownership of the intellectual property and failing to convey those assets—excuses RBC's payment under the Notes.  [Opp. at 17.]  *Stewart* is distinguishable on many grounds, not the least of which being that the case involved the periodic payment of insurance premiums. *Stewart* has no applicability here where, *inter alia*, All Power was purchased in one single transaction.

2012, and thus was obligated to pay the amount due.  Contract law does not permit RBC to simply withhold payment until a viable defense presents itself.[6]  Nor is the Court empowered to retroactively excuse nonperformance.  The undisputed material facts demonstrate that RBC was obligated to pay the full amount of money due under the Notes on June 30, 2012.

In sum, the Court cannot conceive of any way in which to read RBC's obligation to pay the amounts due under the Notes as conditional.  On June 30, 2012, RBC was contractually bound to pay the principal amounts due under the Notes.  It failed to do so and thereby breached the Agreement and Notes.

### C.    Conclusion as to Plaintiffs' Breach of Contract Claim

In conclusion, the Court **GRANTS** Plaintiffs' request for summary judgment as to their breach of contract claims.  There remain no genuine issues of material fact regarding RBC's obligation to pay the amount due under the Notes.

### II.    RBC's Counterclaims

Plaintiffs also move for summary judgment on RBC's nine counterclaims.  All of the counterclaims are based on theory of "Key Employee" misconduct.  As set forth in RBC's FAC:

> RBC is informed and believes and thereon alleges that before Closing and the Rankine and Stanton Notes became due, 'Key Employees' David McCulloch, David Rankine, Jeffrey Rindskopf, and Charles Sharp, as well as Mary Alvarado engaged in fraudulent, unlawful, and wrongful conduct by misappropriating, using disclosing, and obtaining by improper means, the company's trade secret information, including but not limited to its Intellectual Property Assets . . . which information was necessary for the operation of the company's business.

[FAC ¶ 38.]  RBC asserts that this alleged "Key Employee" misconduct is imputed to Plaintiffs Rankine and Stanton by virtue of § 1(c) of the Agreement which provides that, "[t]he Sellers will be deemed to have "Knowledge" of a particular fact

---

[6] This is not to say that RBC is left without legal recourse.  On the contrary, they are entitled to affirmatively seek breach of contract damages should they discover that Plaintiffs breached the contract.  This case cannot provide that forum, as RBC has not stated a viable counterclaim for breach of contract against Plaintiffs.

or other matter if either Seller has Knowledge of such fact or if any Key Employee has Knowledge of such fact or other matter." [*Id.* ¶ 35 (citing Agreement at § 1).] The Agreement defines "Key Employees" to include Baxter Rankine, Charles Sharp, Tom Blanch, David McCulloch, David Rankine, and Jeffrey Rindskopf. [Agreement at § 1.] In 2011, Rindskopf, McCulloch, and Rankine formed a competing company, Caliber Aero, LLC. [*See* Rankine Decl. ¶ 5, Doc. No. 91-8.] RBC asserts–with no supporting evidence[7]–that "[i]t would have been impossible for the Key Employees' further company, Caliber Aero, LLC, to have started, operated, obtained sales, and produced the same products manufactured by All Power, without" "utilizing the information that was derived from [All Power's] intellectual property assets." [Opp. at 12 & fn. 1.]

There is no evidence to support RBC's claim of Key Employee misconduct. It is pure conjecture that the Key Employees utilized All Power's intellectual property assets when forming Caliber Aero, LLC. Moreover, Plaintiffs cannot be held liable for the Key Employees' conduct, even if nefarious. As argued by Plaintiffs, to allow for the "knowledge" of Key Employees to be imputed to Plaintiffs, the alleged misappropriate of All Power's assets must have arisen prior to September 12, 2006—i.e., before the Stock Purchase Agreement was executed. However, all of the subject employees continued to work for All Power for over a year after September 12, 2006. Rankine and Rindskopf resigned approximately one year after the sale [Rankine Decl. ¶ 3; Rindskopf Decl. ¶ 3]; McCulloch resigned in June 2009 [McCulloch ¶ 3]; Alvarado resigned in March 2012. [Alvarado Decl. ¶ 3.] Furthermore, each of the subject employees affirm via declaration that they did not take any All Power or RBC confidential or proprietary information when they resigned from All Power, and that they have never used or disclosed any such

---

[7] The Court sustains Plaintiffs' objection to the deposition testimony of Michael S. Gostomski that "Key Employees" must have wrongfully taken All Power's intellectual property in order for Caliber Aero to operate. This statement lacks foundation and is purely speculative.

1   information in connection with a competing business.  [Rindskopf Decl. ¶ 4;

2   McCulloch Decl. ¶ 4; Rankine Decl. ¶ 4; Alvarado Decl. ¶ 4.]

3          Other than RBC's intuition that it "would have been impossible" for Caliber

4   Aero to have started without misconduct, RBC offers no evidence to support this

5   claim.  Indeed, apart from the "impossibility" argument, RBC otherwise abandons

6   this theory of breach in its opposition to Plaintiffs' summary judgment motion.

7   Rather than stay true to its original theory of liability, RBC recasts its counterclaims

8   as being related to Plaintiffs' failure to disclose that they used Boeing assist letters in

9   order to obtain PMAs from the FAA.  [*See* Opp. at 24-25.]  Yet, this is an entirely

10  new theory of liability, and one that was not pleaded in RBC's counterclaim.

11  Indeed, RBC's counterclaims do not once mention Boeing or PMAs.   On this basis

12  alone, the Court could award summary judgment in Plaintiffs' favor.  *See Coleman*

13  *v. Quaker Oats Co*., 232 F.3d 1271, 1292-93 (9th Cir. 2000) (permitting an

14  unpleaded new theory of liability at the summary judgment stage would prejudice

15  the party against whom the new theory is being brought: the new claim should have

16  been brought by means of a motion to amend at an earlier stage of the litigation).

17         Summary judgment is entered in Plaintiffs' favor on Defendant's

18  counterclaims.

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

<u>CONCLUSION</u>

For the reasons set forth above, the Court **GRANTS** Plaintiffs' motion for summary judgment in its entirety.  Accordingly, judgment shall be entered,

1.  in favor of Plaintiff Rankine against Defendant RBC in the amount of six hundred thousand dollars ($600,000) plus 6.5% annual interest; and

2.  in favor of Plaintiff Stanton against Defendant RBC in the amount of one hundred and fifty thousand dollars ($150,000) plus 6.5% annual interest.

The Clerk of Court is instructed to enter judgment accordingly.

**IT IS SO ORDERED.**

DATED:  November 5, 2013

Hon. Michael M. Anello
United States District Judge

12CV2065